UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| DEREK THOMAS,<br><br>      Plaintiff,<br><br>      v.<br><br>CASSIA COUNTY, IDAHO, a political subdivision of the State of Idaho, JAY M. HEWARD, and MICHAEL AKERS,<br><br>      Defendants. | Case No. 4:17-cv-00256-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

# I. OVERVIEW

There are three motions currently pending before the Court. First, is Defendants Cassia County ("the County") and Jay M. Heward's ("Heward") Motion for Summary Judgment. Dkt. 23. Second, is Defendant Michael Akers' ("Akers") Motion for Summary Judgment. Dkt. 24. Third, is the County and Heward's Motion to Strike. Dkt. 57.

In the present case, Plaintiff Derek Thomas ("Thomas") brings both state and federal law claims. Specifically, Thomas brings claims under 41 U.S.C. § 1983, alleging that Akers violated his First, Second, Fourth, Fifth, and Fourteenth Amendment rights. Thomas brings related claims against Heward and the County, as well as claims under the Idaho Tort Claims Act and Idaho common law. Oral argument was held on December 12, 2018, and the Court took all motions under advisement.

For the reasons set forth below, the Court now GRANTS the County and Heward's Motion for Summary Judgment (Dkt. 23), GRANTS in PART and DENIES in PART Akers' Motion for Summary Judgment (Dkt. 24), and GRANTS in PART and DENIES in PART the County and Heward's Motion to Strike (Dkt. 57).

## II. FACTS

On December 31, 2016, Akers—then a deputy with the Cassia County Police Department—responded to a hit and run call in Burley, Idaho. Akers had been a member of the police department since 2010 and had completed all training required by the State of Idaho. Dkt. 48-1, at 1-2.

The hit and run call to which Akers responded originated from a report made by Thomas' third-cousin, a fifteen-year-old boy referred to as "S.K." Akers drove to S.K.'s residence where he interviewed both S.K. and his grandfather, Harold Povlesen. S.K. told Akers that, while he was riding his motorized bicycle, Thomas struck the back tire of his bicycle with his pickup truck and drove off. Povlesen was able to partially corroborate S.K.'s account, by explaining that—while sitting in his home—he could hear S.K.'s bike approaching. Povlesen thought it sounded like S.K.'s bike "missed a beat" and then he heard another vehicle accelerating. Dkt. 38-13, at 7. Povlesen stepped outside and saw Thomas' pickup truck driving away from S.K. Although Povlesen did not specifically see Thomas as the driver, he was confident that it was Thomas' truck because he was so familiar with Thomas and his vehicle.

Akers then examined S.K.'s bike. The tire appeared ruptured, and green slime—which is used to prevent flat tires by quickly filling small punctures—was sprayed along

the back of the bicycle. The same slime was also sprayed on S.K.'s clothing, which Akers believed further corroborated the allegation.

Prior to receiving this call, Akers had interacted with Thomas on numerous occasions. Thomas worked as a tow-truck driver, and regularly interacted with police officers in that capacity. Thomas also claims that on "several prior occasions," Akers "aggressively confronted" him and asserted that it was illegal for Thomas to openly carry a firearm in public. Dkt. 6, at 2-3. On each of these occasions, Akers allegedly required Thomas to remove his firearm and put it away. *Id.* Akers claims he complained to Sheriff Heward regarding these encounters, but Heward did not punish Akers or do anything to correct his behavior.

After speaking with S.K. and Povlesen, Akers drove to Thomas' home, and was invited inside by Thomas' wife. She informed Akers that Thomas had been home for about fifteen or thirty minutes. When Thomas came out of his bedroom, he told Akers that he had been sleeping for two hours. Akers then asked Thomas about S.K.'s report and Thomas denied the allegations. Following this denial, Akers told Thomas to get his shoes because he was taking him into custody for a "hit and run." Dkt. 38, ex. 15 (body camera footage). As Thomas went to grab his shoes, he told Akers "you need to call Cole [Blauer] because he was with me earlier. I've got a witness." *Id.* Akers did not immediately follow up with this claim, and instead, proceeded with the arrest.

Pursuant to Cassia County policy,[1] Akers handcuffed Thomas with Thomas' arms placed behind his back. At the time of the initial handcuffing, Thomas did not inform Akers that he had a shoulder injury, nor did he say anything that would indicate the handcuffs were causing pain or discomfort. However, as Akers attempted to place Thomas in his patrol vehicle, Thomas complained of shoulder pain, and requested that Akers instead handcuff him with his arms placed in front. Akers explained that—per department policy—he could not handcuff him with his hands in front but could add a second set of handcuffs to mitigate the shoulder pain. Akers proceeded to do so, and Thomas was placed in the squad car without any further indication of pain or discomfort. Thomas now claims that the manner in which Akers handcuffed him and placed him in the patrol vehicle caused a shoulder injury that ultimately required surgery.

Thomas was taken to Cassia County jail. For a period of time immediately following Thomas' arrest, Akers accidentally left his body camera on. This camera captured Akers discussing the arrest with fellow officers. Akers stated to one officer: "Between you me and the walls, I don't like Derek Thomas." Dkt. 38, ex. 15. When another officer asked Akers about the incident, Akers informed the officer that it was S.K. who made the report, and stated: "Yeah, I know, [S.K.'s] kind of a turd himself." *Id.* Shortly thereafter, another officer asked, "is [S.K.] the one who's got a mental handicap?" to which Akers responded, "yeah." *Id.*

---

[1] It is Cassia County policy to handcuff suspects when they are transported in the back of police cars. The policy requires suspects to be handcuffed with their arms placed behind their backs for officer safety. Dkt. 48-1, at 3.

In discussing the proper charge during a telephone conversation with a prosecutor, the camera captured Akers saying, "at a minimum it's a hit and run . . . [but] I'm thinking there is enough for ag[gravated] assault if you think there's enough there." *Id.* Shortly thereafter, Akers said to a fellow officer, "the odds of us getting a conviction out of this are pretty slim. But it would be nice to get a conviction because then we could get his guns. . . . we're always getting reports of him making threats." *Id.*

Because of the three-day holiday weekend, Thomas spent four days in jail before going before a judge. After his initial appearance, he was released from jail on a $75,000 bond.

Cassia County Prosecutor, Douglas Abenroth, reviewed the evidence against Thomas on January 3, 2017. Following his review, he decided to charge Thomas with aggravated assault and to include a deadly weapon enhancement. These charges were later reduced to an infraction for improper equipment, to which Thomas pleaded guilty.

Although Sherriff Heward did not conduct a formal investigation into Akers actions, he did review the relevant police reports, watched Aker's body camera videos, and discussed the matter with him. Heward concluded that, although he might have handled things differently, Akers' actions did not violate Cassia County policies, and no disciplinary action was taken.

On June 12, 2017, Thomas filed the instant action.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather, the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV. ANALYSIS

Thomas' Amended Complaint alleges Akers violated the First, Second, Fourth, Fifth, and Fourteenth Amendments. Akers has moved for summary judgment on all claims.

### A. Thomas' Causes of Action under §1983

### 1. Unlawful Arrest

Thomas claims that his warrantless arrest was unconstitutional. Specifically, he argues that Akers lacked a warrant and probable cause to make the arrest, thereby violating his Fourth Amendment rights.

a.  *Applicable Law*

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City & County of San Francisco*, 266 F.3d 959, 964-64 (9th Cir. 2001). "An officer will not be held to have committed a violation of a defendant's Fourth Amendment right to be free from unlawful arrest if the arrest was carried out with probable cause." *Wilson v. City of Coeur D'Alene*, (D. Idaho Nov. 19, 2010) (citing *Grant v. City of Long Beach*, 315 F.3d 1081, 1089 (9th Cir. 2002)).

"Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Dubner*, 266 F.3d at 966. Importantly, an officer's subjective motivations for carrying out the arrest do not invalidate the arrest, "as long as the circumstances, viewed objectively, justify that action." *Wren v. United States*, 517 U.S. 806, 813 (9th Cir. 1996).

Additionally, "while States are free to regulate [warrantless] arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Virginia v. Moore*, 553 U.S. 164, 176 (2008). Thus, even if an arrest violates state law, that does not automatically mean it violates the Fourth Amendment, as state law may provide enhanced protections. *See Martinez-Medina v. Holder*, 673 F.3d 1029, 1037 (9th Cir.

2011) ("Even though the officers violated state law when they arrested Moore, that state law violation did not constitute a Fourth Amendment violation."); *see also Moore*, 553 U.S., at 175 ("Incorporating state-law arrest limitations into the Constitution would produce a constitutional regime no less vague and unpredictable than the one we rejected" in *Atwater v. Lago Vista*, 532 U.S. 318 (2001)).

Accordingly, whether Idaho law permits warrantless arrests for misdemeanors committed outside of an officer's presence is immaterial here, because under federal law, warrantless arrests based upon probable cause can be legal even if the alleged crime was committed outside of the officer's presence. *See Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990). "The requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment." *Id.* "Thus, the vitality of [a] section 1983 action is not dependent on whether [an officer] was present when . . . the misdemeanor [was committed]. Rather, the crucial inquiry is whether [the officer] had probable cause to make the arrest." *Id.*

Although the existence of probable cause is highly dependent on the facts of each case, "whether a reasonable officer could have believed probable cause . . . existed to justify a search or an arrest is an essentially legal question that should be determined by the district court at the earliest possible point in the litigation." *Peng v. Hu*, 335 F.3d 970, 979-80 (9th Cir. 2003) (citations and punctuation omitted). Accordingly, "where the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts, it is appropriate for th[e] court to decide whether probable cause existed at the time [of the arrest]." *Id.*

*b. Analysis*

At the time of Thomas' arrest, Akers informed him that he was taking him into custody for a hit and run violation. Presumably Akers was referring to Idaho Code section 49-1301, which states:

> "The driver of any vehicle involved in an accident, either on public or private property open to the public, resulting only in damage to a vehicle which is driven or attended by any person shall immediately stop the vehicle at the scene of the accident, or as close as possible, and shall immediately return to, and in every event shall remain at, the scene of the accident until he has fulfilled the requirements of law. . . . Any person failing to stop or to comply with the requirements under these circumstances shall be guilty of a misdemeanor."

It should be noted that "[b]ecause the probable cause standard is objective, probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest." *United States v. Struckman*, 603 F.3d 731, 741 (9th Cir. 2010). However, the officer's stated reason for the arrest is a good place to begin this inquiry. Akers told Thomas that he was arresting him for hit and run, and based upon the undisputed facts of the case, the Court finds that he had probable cause to do so.

In viewing the totality of circumstances known to Akers at the time of the arrest, a prudent officer could have believed Thomas was guilty of leaving the scene of an accident. First, S.K. told Akers that Thomas hit him with his truck. This account was corroborated by S.K. grandfather, who told Akers that he saw Thomas' truck speeding away from the scene. Akers also examined S.K.'s bike, which had a damaged tire. He

also observed green tire slime on the back of S.K.'s clothing, which was consistent with S.K.'s account of his bike being hit from behind.

Akers then went to Thomas' house and was informed by Thomas' wife that he had only been home for 15-30 minutes. Shortly thereafter, Thomas contradicted his wife's statement by claiming he had been home (and asleep) for two hours. This further supported Akers' suspicions that S.K.'s allegation was true because such an inconsistency could reasonably be viewed as Thomas trying to falsify an alibi.

Admittedly, the fact that Thomas' truck was not splattered with green tire slime perhaps undermines S.K.'s story. However, there are plausible theories that could explain the lack of green slime besides Thomas not being involved in the incident (e.g. Thomas wiped any green slime off his truck once he returned home). This oddity, standing alone, is not enough to overcome a finding of probable cause.

Thomas also asserts that at the time of S.K.'s report, Akers was aware that S.K. had a reputation for untruthfulness and a strained relationship with Thomas, which undercuts his claim that probable cause existed. The Court, however, finds this argument unconvincing. While Akers was at least somewhat familiar with S.K. and Thomas prior to the events in question—and may have even known of their strained relationship[2]—that

---

[2] For example, during his deposition, S.K. explained that when Akers' responded to his call, S.K. recognized him from prior interactions stemming from "other problems that I've had with [Thomas]." Dkt. 38-11, at 17. Akers also believed that S.K. had some sort of mental and/or behavioral deficiency. Shortly after Thomas' arrest, Akers' body cam captured him telling another individual that S.K. is a "turd." He also replied "yeah" when another officer asked him if S.K. had a mental handicap.

does not automatically delegitimize his finding of probable cause. S.K.'s reliability was simply one relevant consideration in Akers' investigation.

Importantly, Akers did not rely solely on S.K.'s statement to establish probable cause. He also interviewed Povlesen, who informed him that he saw Thomas' truck speeding away from the scene. He then examined S.K.'s clothing and bicycle and found physical evidence that corroborated the allegation. He then spoke with Thomas and his wife, who contradicted each other regarding how long Thomas had been home. Even construing the facts in the light most favorable to Thomas (and presuming Akers' had reasons to doubt S.K.'s reliability), Akers' investigation still uncovered sufficient corroborating material to bolster S.K.'s credibility and establish probable cause.

Thomas, however, argues that Akers' pre-arrest investigation was insufficient, and that a finding of probable cause is improper because there was so much more Akers could have done to investigate S.K.'s report. It is true that—in various cases—the Ninth Circuit has found that probable cause had not been established because there was "much else the officers could have done." *See*, *e.g.*, *Frunz v. City of Tacoma*, 468 F.3d 1141, 1146 (9th Cir. 2006).

However, after reviewing the relevant case law, the Court finds that Akers' pre-arrest investigation was sufficient to establish probable cause. He did not simply rely on the claim of one citizen witness.[3] Nor did he fail to examine the scene or relevant items

---

[3] As discussed in *Fuller v. M.G. Jewelry*, 950 F.2d 1437 (9th Cir. 1991).

for physical evidence that could corroborate S.K.'s allegation.[4] As recounted above, his investigation was much more thorough than that.

There will likely always be something more that officers can do when investigating an alleged crime, but the probable cause standard simply requires enough evidence to allow a prudent person to believe there is "a fair probability that the suspect committed a crime." *United States v. Gonzales*, 749 F.2d 1329, 1337 (9th Cir. 1984). While Thomas' guilt was by no means firmly established, the evidence Akers uncovered during his investigation was enough to establish probable cause.

Finally, Thomas argues that even if probable cause existed, the arrest was still unconstitutional because he was arrested inside of his home without a warrant. It is true that the Fourth Amendment "generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects," *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). However, this prohibition "does not apply to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Id.* (citations omitted). Here, Akers was invited inside by Thomas' wife, thereby obviating the need for a warrant to enter the home.

In sum, the Court finds that—based upon the information known to Akers at the time—a reasonable officer could have found probable cause to arrest Thomas for hit and run. While the Court is not convinced that Akers' motivations were pure when he decided

---

[4] As discussed in *Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009).

to arrest Thomas, probable cause is an objective standard, and Akers' subjective

motivations are irrelevant to this inquiry. Accordingly, Thomas' arrest was not unlawful,

and the Court GRANTS Akers' Motion for Summary Judgment on this claim.

## 2. **Excessive Force**

### a. *Applicable Law*

This Court recently discussed the law that applies to excessive force claims:

> When an arrestee "alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865, 188 L. Ed. 2d 895 (2014). That amendment requires that officers use only an amount of force that is "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (internal quotation marks omitted). Importantly, police officers are not required to use the least amount of force necessary to arrest a suspect. *Luchtel v. Hagemann*, 623 F.3d 975, 982 (9th Cir. 2010). . . . [W]hether an officer's use of force was objectively reasonable is based on the totality of the circumstances. *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted). The objective reasonableness inquiry requires "balancing the nature and quality of the intrusion on a person's liberty with the countervailing governmental interests at stake." *Davis*, 478 F.3d at 1053-54 (internal quotation marks omitted).

> When analyzing excessive force claims, courts consider several factors in this balancing test. First, the "quantum of force" used by the police must be assessed. *Id.* at 1054. Second, the governmental interests at stake must be analyzed in light of the following factors: (1) the severity of the crime for which the plaintiff was arrested; (2) whether the plaintiff posed a threat to the safety of the officers or others; (3) whether the plaintiff was actively resisting arrest or attempting to flee; and (4) the availability of alternative methods of subduing the plaintiff. *Id.*; *see also Graham*, 490 U.S. at 396. . . .

> Of these governmental interest factors, whether the suspect posed a threat is the "most important single element." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (internal quotation marks omitted). If an arrestee has "not in any way threatened [an officer or others] or indicated any

propensity for violent behavior," it is likely that the use of substantial force will be objectively unreasonable. *Young*, 655 F.3d at 1166.

If—after balancing "the gravity of the intrusion on the individual against the government's need for that intrusion," *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010)—the reviewing court determines that the force applied was objectively reasonable, summary judgment in favor of the officers is appropriate. Contrarily, if the evidence, when viewed in the light most favorable to the plaintiff, could reasonably support a finding that the force used was objectively unreasonable, then the officers are not entitled to summary judgment. *Smith*, 394 F.3d at 701.

*Moore v. City of Boise*, No. 1:16-cv-00346-BLW, *37-40 (D. Idaho March, 26, 2018).

"Determining whether a police officer's use of force was reasonable . . . requires careful attention to the facts and circumstances of each particular case and a careful balancing of an individual's liberty with the government's interest in the application of force." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (internal citations and punctuation omitted). "Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.* That said, defendants "can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1997).

b. *Analysis*

Thomas argues that Akers "cuffed [him] with such force that it tore [his] shoulder tendons" and that any use of force was unreasonable in this case because Thomas' arrest was unconstitutional. Dkt. 52, at 11. However, since the Court has now determined that

Akers did, in fact, have probable cause to arrest Thomas, this argument (that *any* use of force was unreasonable) is unavailing. Accordingly, *some* level of force may have been reasonable, and the Court's analysis moves on to the balancing test set forth above.

The Court first examines the "quantum of force" used. The Ninth Circuit has found that "[i]t is well-established that overly tight handcuffing can constitute excessive force." *Wall v. County of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004). However, Thomas' claim that Akers handcuffed him with excessive force is hard to accept— particularly in light of the footage captured by Aker's body camera. This footage is significant because the Supreme Court has explained that "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372 (2007) (quoting Fed. Rule Civ. Proc. 56(c)). Due to the clear video evidence available to the Court, there is no genuine dispute as to the facts related to Thomas' excessive force claims, and the Court will view the relevant facts in the light depicted by the videotape. *See Scott*, 550 U.S. at 380-81.

The video shows nothing more than a routine, non-violent handcuffing, carried out in a reasonable manner. During this routine handcuffing, Thomas did not give any indication of pain or discomfort. In fact, the video shows nothing that would have alerted a reasonable officer that Thomas was experiencing pain until Akers attempted to place Thomas in his patrol vehicle.[5] When that occurred, Akers immediately allowed Thomas

---

[5] Importantly, there is no indication in the record (nor does Thomas claim) that Akers was aware that Thomas had a pre-existing shoulder injury before placing him in handcuffs.

to stand up, and added a second set of handcuffs to alleviate Thomas' discomfort. Once Akers' did so, Thomas gave no further indication of pain or discomfort. Accordingly, the quantum of force used was extremely low.

Next, the Court analyzes the government interests at stake in light of the following factors: (1) the severity of the crime for which the plaintiff was arrested; (2) whether the plaintiff posed a threat to the safety of the officers or others; (3) whether the plaintiff was actively resisting arrest or attempting to flee; and (4) the availability of alternative methods of subduing the plaintiff. *See Davis*, 478 F.3d at 1053-54.

Admittedly, the results of this analysis do not warrant the use of much force. Leaving the scene of an accident is a misdemeanor and does not warrant heightened force. Likewise, at the time of the arrest, Thomas did not pose a threat to the safety of Akers or anyone else. He was compliant throughout the entire handcuffing and arrest process, and never attempted to resist or flee.

That said, Akers hardly used any force at all. Simply placing an arrestee in handcuffs to be transported to the police department—even when the arrestee is being compliant—is a reasonable safety precaution that the government has an interest in performing to protect themselves and others. *See LaLonde v. County of Riverside*, 204 F.3d 947, 964 (9th Cir.2000) ("Handcuffing an arrestee is standard practice, everywhere."). The manner in which Akers carried out the handcuffing was routine and non-violent, and his reaction to Thomas' expression of pain was swift and reasonable.

The Court, therefore, GRANTS Akers' Motion for Summary Judgment on this claim.[6]

### 3. **Malicious Prosecution**

To prevail on a malicious prosecution claim brought under §1983, Thomas must show that (1) the defendants prosecuted him with malice, (2) the defendants lacked probable cause, (3) the prosecution was done for the purposes of denying equal protection or other constitutional rights and (4) that the underlying criminal case was terminated in Thomas' favor. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066, 1068 (9th Cir. 2004).

Since the Court has now determined that Akers had probable cause to arrest Thomas, Thomas cannot establish the required elements of malicious prosecution. Accordingly, the Court GRANTS summary judgment on this claim. *See Beck v. City of Upland*, 527 F.3d 853, 865 (9th Cir. 2008) ("[I]t is necessary, if not sufficient, that a plaintiff seeking to sue non-prosecutorial officials alleged to be responsible post-complaint for the arrest or prosecution show the absence of probable cause.").

### 4. **First Amendment Claim**

Thomas claims that Akers arrested and imprisoned him in retaliation for his past challenges to Akers' authority when Akers sought to prevent him from openly carrying firearms in public. Although Defendants do not agree with Thomas regarding the nature

---

[6] The Court's decision to grant summary judgment is further supported by Thomas' failure to produce any medical documentation that proves his claimed injuries. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("Because Arpin failed to meet her burden of proof of providing specific facts to show that the force used was unreasonable *or that she sustained actual injuries*, the district court did not err in granting summary judgment to the County Defendants.") (emphasis added).

of these prior interactions, for purpose of these summary judgment motions, the Court construes the facts in the light most favorable to Thomas.

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). "[C]riticism of the police for what [an individual] perceived to be an unlawful [use of authority] falls squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech . . . is categorically prohibited by the Constitution." *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990).

While an individual's critical comments may be "provocative and challenging," they are "nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949)). In fact, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462-63.

An individual has a right "to be free from police action motivated by retaliatory animus but for which there was probable cause." *Skoog v. County of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006). As such, even if Akers had probable cause to arrest Thomas, he may have still violated Thomas' First Amendment rights if the arrest was *actually* made in retaliation for Thomas' protected speech.[7] Thus, the First Amendment

---

[7] The Supreme Court of the United States heard oral argument on November 26, 2018, in a case challenging the Ninth Circuit's holding that a plaintiff can still prevail on a retaliatory arrest

analysis differs from the probable cause analysis conducted above, because Akers'
subjective motivations become relevant.

In order to establish a claim of retaliation in violation of the First Amendment,
Thomas must show two things: first, "that the officers' conduct would chill a person of
ordinary firmness from future First Amendment activity," and second, "that the officers'
desire to chill his speech was a but-for cause of their allegedly unlawful conduct." *See*
*Lacey v. Maricopa County*, 693 F.3d 896, 916-17 (9th Cir. 2012) (en banc).

  *i.*  *Chilled Speech*

In *Ford v. City of Yakima*, the Ninth Circuit examined a First Amendment
retaliation claim, and found that "a person of ordinary firmness would be chilled from
future exercise of his First Amendment rights if he were booked and taken to jail in
retaliation for his speech." 706 F.3d 1188. Clearly, if—as Thomas claims—Akers'
decision to arrest him was made with retaliatory animus, such action would chill a person
of ordinary firmness from challenging improper police conduct in the future.
Accordingly, Thomas has satisfied the first element.

  *ii.*  *Causation*

To satisfy the second element, Thomas must present sufficient evidence to
establish that Akers' desire to chill his speech was a but-for cause of his conduct. In other
words, the Court must ask whether Akers would have arrested and sought to bring

---

claim even if the officers had probable cause to make the arrest. *Nieves v. Bartlett*, 138 S. Ct.
2709 (2018). A decision has not yet been issued, but the outcome of that case could very well
affect the outcome of this case. However, as the Ninth Circuit's holding remains good law as of
now, the Court adheres to the existing standard.

charges against Thomas but for his desire to punish Thomas for his speech. Here, despite Akers having probable cause to arrest Thomas, some of his subsequent statements cast doubt over his motivations. Particularly concerning to the Court is the video evidence that shows Akers' admitting he did not like Thomas, that he thought the odds of getting a conviction on the aggravated assault charge were "slim," and admitting that he would like to get a felony conviction in order to get Thomas' guns taken away from him.

In light of these statements, a genuine issue for trial exists on this claim. A reasonable jury could find that—despite the existence of probable cause—Akers had a retaliatory motive that was a but-for cause of his actions. Accordingly, the Court DENIES Akers' Motion for Summary Judgment on this claim.

### 5. **Second Amendment Claims**

Thomas' Amended Complaint appears to contain two Second Amendment claims: a retaliation claim, and an attempted deprivation claim. First, Thomas contends that Akers' decision to arrest him was motivated by the desire "to retaliate against and punish [him] for his prior exercise of his Second Amendment right to openly carry a sidearm on his own property." Dkt. 6, at 5. Next, Thomas claims that Akers' actions were also motivated by a desire to "prevent [him] from similarly exercising his . . . Second Amendment rights in the future." *Id.* The Court considers each claim in turn:

#### a. *Second Amendment Retaliation*

"The Government is prohibited from retaliating for the lawful exercise of constitutional rights." *Louisiana Pac. Corp. v. Beazer Materials & Servs.*, Inc., 842 F. Supp. 1243, 1256 (E.D. Cal. 1994). However, "[s]ection 1983 retaliation claims are

usually based on First Amendment activities." *Horn v. City of Covington*, No. CV 14-73-DLB-CJS, 2018 WL 3865377, at *8 (E.D. Ky. Aug. 14, 2018). As a result, case law addressing Second Amendment retaliation claims is sparse, and the Court is not aware of a case in which the Ninth Circuit has directly analyzed a Second Amendment retaliation claim. However, a brief examination of the analytical frameworks applied to retaliation claims throughout the country, including within the Ninth Circuit, is instructive.

The Sixth Circuit has explained that "[r]etaliation claims arise in any number of contexts. The essence of such a claim is that the plaintiff engaged in conduct protected by the Constitution . . . the defendant took an adverse action against the plaintiff, and this adverse action was taken (at least in part) because of the protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386-87 (6th Cir. 1999). The Third Circuit analyzes constitutional retaliation claims under a similar three-part test. *See Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 282 (3d Cir. 2004) ("Plaintiff must prove (1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation.").

These frameworks closely resemble the Ninth Circuit's approach to retaliation claims in other settings. The Court already laid out the Ninth Circuit's general test for First Amendment retaliation claims above. Similarly, to establish a First Amendment retaliation claim in the student speech context, a plaintiff must show that "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's

conduct." *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006) (citations omitted). In the realm of employment law, "[t]o make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (citation omitted).

These cases demonstrate that—in any context—retaliation claims are analyzed in a similar manner within the Ninth Circuit and throughout the country. As such, the Court finds that drawing from, and adapting, the Ninth Circuit's approach to First Amendment retaliation claims is appropriate here. Thus, for Thomas to succeed on his Second Amendment retaliation claim, he must establish three things: (1) that he engaged in a constitutionally protected activity, (2) that Akers' actions would chill a person of ordinary firmness from engaging in future Second Amendment activity, and (3) the protected activity was a but-for cause of Akers' conduct.

Under the first two factors, Thomas has set forth sufficient allegations to survive summary judgment. Thomas claims that on multiple occasions prior to his arrest, Akers "aggressively confronted" him while he was openly carrying a firearm in public, and asserted that it was illegal for Thomas to do so. On each of these occasions, Akers allegedly required Thomas to remove his firearm and put it away. Dkt. 6, at 2-3. Since these alleged altercations, the Ninth Circuit has clarified that the right to openly carry a firearm for self-defense is protected by the Second Amendment. *Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018). As such, these allegations are enough to show that Thomas

was engaged in a constitutionally protected activity.[8] Likewise, if—as Thomas claims—Akers' decision to arrest him was made with retaliatory animus, such action would chill a person of ordinary firmness from engaging in future Second Amendment activity.

Additionally, the Court finds that a genuine issue for trial exists on whether a but-for cause of Akers' decision to arrest Thomas was a desire to retaliate for Thomas' prior exercise of his Second Amendment rights. This finding is supported by Akers' alleged aggressive confrontations with Thomas in which he required Thomas to put away his firearms, as well as his unintentionally recorded statements indicating that he does not like Thomas, that he thought the odds of getting a conviction on the aggravated assault charge were "slim," and that he would like to get a felony conviction in order to get Thomas' guns taken away from him.

Akers' contends that he is entitled to qualified immunity on Thomas' Second Amendment claim because the Ninth Circuit did not clearly establish that the right to openly carry a firearm for self-defense was protected by the Second Amendment until July 24, 2018, in *Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018). The Court disagrees.

---

[8] Akers argues that Thomas may not have had a right to possess a firearm in the first place, because he was convicted of a felony in 2011. It is true that convicted felons do not have a constitutional right to bear arms (*see United States v. Vongxay*, 594 F.3d 1111, 1117-18 (9th Cir. 2010)), and there is nothing in the record that clarifies whether Thomas' felony conviction was expunged prior to the events in question. However, under Idaho law (and subject to limited exceptions that do not apply here), a convicted felon's full rights of citizenship are generally restored at the conclusion of their sentence. Idaho Code §§ 18-310(1), (2). Because there is nothing in the record to indicate otherwise, the Court presumes for purposes of the pending motions that Thomas' sentence stemming from his felony conviction had run its course, and that the state of Idaho had fully restored his rights—including his right to possess firearms.

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). It protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights about which a reasonable person would have known. *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011).

Akers is entitled to such relief only if the facts alleged and evidence submitted, resolved in Thomas' favor and viewed in the light most favorable to him, show that the offending conduct did not violate a federal right; or, if it did, the scope of that right was not clearly established at the time. *See*, *e.g.*, *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004). If no violation of a constitutional right is found, Thomas cannot prevail. "On the other hand, if there is a violation (or if there is a triable question of fact in that regard), then [the Court] must determine whether that constitutional violation was clearly established at the time." *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007).

Here, Akers' qualified immunity argument misses the mark. Although "there is something particularly unfair about holding officials liable for conduct that they did not (and could not) know was unlawful *at the time they decided to act*," (*Rhodes v. Robinson*, 408 F.3d 559, 570 (9th Cir. 2005) (emphasis in original)), that is not the case here. Thomas is not seeking to hold Akers liable for the act of requiring him to put his guns away. Thomas is seeking to hold Akers liable for the act of retaliation. Thus, Akers is only entitled to qualified immunity if it was not clearly established that retaliating for the

exercise of constitutionally protected activities was prohibited. Clearly that is not the case, because—long before the events in question—the Ninth Circuit specifically stated that "the prohibition against retaliatory punishment is clearly established law . . . for qualified immunity purposes." *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (punctuation omitted). Accordingly, the Court DENIES Akers' Motion for Summary Judgement as it relates to Thomas' Second Amendment retaliation claim.

### b. Attempted Deprivation

Thomas contends that in addition to his retaliatory animus, Akers actions were motivated by a desire to deprive Thomas of his guns, and "prevent him from exercising his . . . Second Amendment rights in the future." Dkt. 6, at 5. In his Memorandum in Opposition to Summary Judgment, he states that Akers wanted to "'get [Thomas'] guns taken away from him.' All of them. All the time. Regardless of his location in or outside his home. That is exactly what would have happened *had Akers been successful in his plot*." Dkt. 52, at 15 (emphasis added). This argument, however, is not enough to sustain a Second Amendment deprivation claim.

In order to state a viable cause of action under 42 U.S.C. § 1983, Thomas "must show the actual deprivation of [his] rights—an attempted deprivation alone is insufficient." *Bari v. Held*, 1992 U.S. Dist. LEXIS 13634, *22 (N.D. Cal. Aug. 31, 1992) (citing *Andree v. Ashland County*, 818 F.2d 1306, 1311 (7th Cir. 1987)); *see also Yan Sui v. Marshack*, No. SACV 13–1607 JAK (AJW), 2015 WL 1637424, at *5 (C.D. Cal. Feb. 4, 2015) ("[P]laintiffs have cited no authority for the proposition that an 'attempted' violation of their Fifth Amendment or section 1983 rights is actionable, and the Court has

found no authority for the existence of liability for an attempted violation of those rights.").

Here, even if Akers intended to deprive Thomas of his Second Amendment rights, no deprivation actually occurred as a result of his actions.[9] Accordingly, the Court GRANTS Akers' Motion for Summary Judgment as it relates to Thomas' Second Amendment deprivation claim.

**6. <u>Fifth and Fourteenth Amendment Claims</u>**

As an initial matter, "[t]hat the Fifth Amendment applies only to the acts of the federal government is settled beyond doubt." *Johnston v. Earle*, 245 F.2d 793, 796 n.5 (9th Cir. 1957). As there are no federal actors involved here, the Fifth Amendment is inapplicable. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law."). Accordingly, the Court considers only Thomas' Fourteenth Amendment claim.

Unfortunately, the nature of this claim is not well defined in Thomas' Amended Complaint. At the very least, Thomas seems to contend that Akers violated the Fourteenth Amendment when he (Akers) arrested Thomas without a warrant or probable

---

[9] Thomas' Concealed Weapons Permit was revoked at some point after the incident in question. However, the permit was revoked pursuant to a civil protection order that, according to Thomas, was entered in June of 2017. Dkt. 38-2, at 5-6. The issuance of that order was so far removed from Akers' conduct and Thomas' December 31, 2016, arrest that it cannot sustain Thomas' Second Amendment deprivation claim.

cause, thereby leading to four days of imprisonment. However, because Akers had probable cause to arrest Thomas, this claim is without merit.

Additionally, Thomas' Memorandum in Opposition to Summary Judgment does not include any argument in support of his Fourteenth Amendment claim, nor did he make such arguments at the motion hearing held on December 12, 2018. Accordingly, Thomas has abandoned his Fourteenth Amendment claim. *See Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2009) (explaining "a plaintiff . . . abandoned . . . claims by not raising them in opposition to [the defendant's] motion for summary judgment") (quoting *Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)); *Knowles v. Hawai'i Pac. Univ.*, Civ. No. 1600678ACKKSC, 2018 WL 3370520, at *7 (D. Haw. July 10, 2018) ("By failing to make any argument regarding the claim, Plaintiff has abandoned it."). As such, there is no genuine issue for trial, and the Court GRANTS summary judgment on Thomas' Fifth and Fourteenth Amendment claims.

### 7. <u>Municipal Liability</u>

Thomas' Amended Complaint claims that the County had an official policy or custom that permitted law enforcement officers "to make warrantless arrests without probable cause of individuals and to make false or unsupported criminal allegations, charges and prosecutions against citizens in order to punish them for exercising their First Amendment rights to express their disagreement with its officers and to unlawfully deprive them of their firearms." Dkt. 6, at 5. Since the Court has now determined that Akers had probable cause to arrest Thomas, and that Thomas was not unlawfully

deprived of his firearms, the Court need only consider this claim as it relates to Thomas' constitutional retaliation claims.

*a. Applicable Law*

"Municipalities, their agencies, and their supervisory personnel cannot be held liable under section 1983 on a theory of respondeat superior. They can, however, be held liable for deprivations of constitutional rights resulting from their policies or customs." *Shaw v. Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 610 (9th Cir. 1986) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)).

The Ninth Circuit has explained that a section 1983 plaintiff may establish municipal liability in one of three ways:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure' of the local governmental entity. . . .

> Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself thus constituted an act of official governmental policy. . . .

> Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (internal citations and punctuation omitted). That Akers did not have final policy-making authority is not in dispute, and the Court need not consider it here.

Importantly, municipalities are not immune from liability for "good faith constitutional violations." *Owen v. City of Independence, Mo.*, 445 U.S. 622, 650 (1980).

Similarly, a "municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983," because "municipalities have no immunity from damages liability flowing from their constitutional violations." *Id*. at 638, 657. Accordingly, although Akers and Heward may assert qualified immunity as a defense, the County cannot.

    *b. Analysis*

        *i.    Proof of Policy or Custom*

To prevail on this theory, Thomas must prove "the existence of a widespread practice that . . . is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotations omitted). Additionally, "a section 1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette*, 979 F.2d, at 1349.

Here, Thomas has not shown that the constitutional violations Akers allegedly committed against him were widely practiced within the County, or so well-settled as to constitute a custom. In fact, Thomas has not alleged a single instance of similar conduct being carried out by employees other than Akers.

However, Thomas correctly contends that the offending policy can be one of inaction. *See City of Canton v. Harris*, 489 U.S. 377-78 (1989) (failure to train), *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) ("The need for different procedures was so obvious that [the Sheriff's] adamant refusal to take action amounted to deliberate

indifference to the detainees' constitutional rights."). Under an "inaction" policy claim, "a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185-86 (9th Cir. 2006).

"To impose liability against a county for its failure to act, a plaintiff must show: (1) that a county employee violated the plaintiff's constitutional rights; (2) that the county has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights." *Long*, 442 F.3d at 1186. Here, the Court has already determined that a genuine issue for trial exists regarding Thomas' constitutional retaliation claims. As such, Thomas has satisfied the first element of an "inaction" policy claim.

In *Canton*, the Supreme Court held that a municipality's failure to train its employees can constitute the requisite inaction by the municipality. 489 U.S. at 392. "In order to prevail on such a claim, [Thomas] must show that [the County's] failure to train amounted to deliberate indifference." *Canell v. Lightner*, 143 F.3d 1210, 1214 (9th Cir. 1998).

To establish deliberate indifference, Thomas must allege facts showing the County "disregarded the known or obvious consequence that a particular omission in their training program would cause [municipal] employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Generally, a pattern of similar constitutional violations by untrained employees is necessary to meet this requirement. *Id.* at 62. Here, Thomas has not shown such a pattern, and as already noted, he has not

alleged a single instance of similar conduct being carried out by employees other than Akers.[10]

Thus, even though "[w]hether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury," *Oviatt*, 954 F.2d at 1478, the Court finds that Thomas' allegations—even if true—are not enough to allow a reasonable jury to find that the County acted with deliberate indifference towards its officers' training.

Additionally, even if the Court were to assume, *arguendo*, that the County had acted with deliberate indifference, there is nothing to suggest that the County's custom or policy was "the moving force behind [Akers'] violation of constitutional rights." *Long*, 442 F.3d at 1186. For a policy to be the moving force behind the deprivation of a constitutional right, "the identified deficiency in the policy must be closely related to the ultimate injury. . . . The plaintiff's burden is to establish that the injury would have been avoided had proper policies been implemented." *Id.* at 1190 (citations and punctuation omitted).

Once again, Thomas comes up short. At this point, his only potentially viable claims involve constitutional retaliation. However, he has provided no logical nexus

---

[10] Likewise, even though the County cannot raise qualified immunity as a defense, if Thomas' contention is that the County should have provided training regarding the Second Amendment right to openly carry a firearm in public, the consequences of such a deficiency in their training program could not reasonably be considered "known or obvious" in 2016 because the Ninth Circuit had not clearly established that the Second Amendment included that right until 2018.

connecting the County's policies or customs to Akers' alleged retaliation. In fact, in support of his "inaction" theory, Thomas states:

> The County's policies caused or materially contributed to Mr. Thomas' constitutional deprivations in several respects. Mr. Thomas had complained to Sheriff Heward before December 26, 2016 about Akers, on three or four prior occasions, when Akers disarmed him in violation of his legal rights. . . . Defendant Heward took no action to correct Akers' conduct, provided no training to his deputies, and implemented no policies that to ensure the protection of County residents' gun rights.

Dkt. 53, at 5.

The problem for Thomas, however, is that his remaining claims for which the County could be held liable (i.e. the "ultimate injury" at issue here) are constitutional retaliation claims—not a deprivation of Thomas' Second Amendment right to bear arms. Thus, even if his allegations are true, he has provided no basis for finding that the County's policies and procedures were the moving force behind Akers' alleged constitutional retaliation. Accordingly, the Court finds that Thomas cannot establish municipal liability via a policy or custom promulgated by the County.

### ii. Ratification

Ratification by an official policymaker can trigger municipal liability. *Gillette*, 979 F.2d at 1348. In fact, a "single decision by a municipal policymaker may be sufficient to trigger section 1983 liability under *Monell,* even though the decision is not intended to govern future situations. There must, however, be evidence of a conscious, affirmative choice." *Id.* at 1347. "Municipal liability under section 1983 attaches only where 'a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject

matter in question.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986).

Thomas argues that holding the County liable for Akers' conduct is proper because "[n]either [Heward] nor anyone else ever told Akers he had done anything wrong or [violated] Cassia County policy. . . . [and] decided that no disciplinary action against Akers was warranted." Dkt. 53-1, at 24-25. Thomas further claims that Heward "specifically approved of Akers' arrest of Mr. Thomas for hit and run and for allegedly giving false information . . . despite the overwhelming evidence to the contrary." *Id.* However, this argument misconstrues Heward's conduct, and is not enough to establish municipal liability.

First, for municipal liability to attach, an official policymaker must make a deliberate choice from among various alternatives to follow a particular course of action. *Pembaur*, 475 U.S. at 483-84. That is not the case here. Heward simply reviewed Akers' conduct after Thomas had already been arrested. He did not direct Akers to arrest Thomas, nor did he approve of that decision before it occurred.

Second, a policymaker must approve of a subordinate's decision and the basis for it before he will be deemed to have ratified the subordinate's discretionary decision. *See Bouman v. Block*, 940 F.2d 1211, 1231 (9th Cir.) Again, that is not the case here. Heward did not "approve" of Akers' conduct, nor did he cast his decision to not discipline Akers in the form of a policy statement. He simply stated that, although he would have done things differently, Akers had not violated County policies (because he had probable cause to arrest Thomas) and therefore was not subject to discipline. The Court finds that no

reasonable juror could find that Heward ratified Akers' alleged misconduct. Accordingly, the Court GRANTS the County and Heward's Motion for Summary Judgment on this claim.

## 8. <u>Supervisorial Liability</u>

Thomas claims that "Sheriff Heward failed to properly train, supervise and control Akers regarding Plaintiff's First and Second Amendment[] [rights] which guaranteed and protected Plaintiff's right to openly carry a sidearm and to express his right to do so, but instead approved, affirmed and ratified Akers' misconduct." Dkt. 6, at 5. While the nature of this claim closely resembles Thomas' claim against the County, it differs in that this claim is brought against Heward individually.

Heward can be held liable in his individual capacity "'for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'" *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)). Heward's liability "hinges on whether he 'set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury.'" *Watkins*, 145 F.3d, at 1093 (quoting *Larez*, 946 F.2d, at 646).

The most concerning allegation against Heward is his failure to do anything after Thomas allegedly complained about Akers' confronting him for openly carrying his

firearm in public. However, the Court finds this failure to act understandable under the qualified immunity analysis.

As noted above, "[q]ualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Katz*, 533 U.S. at 200. It protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights *about which a reasonable person would have known*. *Mattos*, 661 F.3d at 440 (emphasis added).

Here, the Court finds that, since the Ninth Circuit had not clearly established that the Second Amendment includes an individual right to openly carry a firearm in public until 2018, it was reasonable for a person in Heward's position to not know Akers misunderstood the law, or that his officers needed additional Second Amendment training. Accordingly, even if Thomas' allegations are true, Heward's failure to correct Akers' behavior, or implement training to educate officers about the Second Amendment right to openly carry a firearm in public, is excusable under the qualified immunity analysis.

Additionally, there is nothing in the record that suggests inadequate training regarding citizens' First Amendment rights, or that Heward approved of Akers' alleged retaliation against Thomas. He simply reviewed the incident after the fact and found that—because probable cause existed for the arrest—no violation of County policies occurred, and no discipline was required. This is not enough to hold Heward liable. Accordingly, the Court GRANTS the County and Heward's Motion for Summary Judgment on this claim.

### B. Thomas' State Law Claims

Thomas also brings claims under the Idaho Tort Claims Act ("ITCA") and Idaho common law. However, Thomas' Amended Complaint does not specify what his Idaho common law claims are, nor has he provided any argument in defense of those claims. As such, he has abandoned them, and the Court GRANTS summary judgment on his common law claims. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009) ("Plaintiff] abandoned his state law claims by not addressing them in either his Motion for Partial Summary Judgment or his Opposition to Defendants' Motion for Summary Judgment.").

As a result, only Thomas' ITCA claim remains. ITCA subjects government entities to liability for an entity's own negligent or wrongful acts, or the negligent or wrongful acts of its employees where a private person would also be liable. *See* Idaho Code § 6-903(1). However, the Act states that a "governmental entity may refuse a defense or disavow and refuse to pay any judgment for its employee if it is determined that the act or omission of the employee was not within the course and scope of his employment *or included malice* or criminal intent." Idaho Code § 6-903(3) (emphasis added).

In *Sprague v. City of Burley*, 710 P.2d 566 (1985), the Idaho Supreme Court explained that ITCA "specifically exempts governmental entities from liability where the employees act with malice." *Id.* at 579. As a result, the Court found that "[s]ince Sprague's amended complaint alleged that the officers acted with malice . . . it is clear that as a matter of law Sprague could not recover from the City of Burley. Hence, the

district court properly granted the City's motion for summary judgment as to Sprague's state law claims against the City." *Id.* at 579-80.

Here, Thomas contends that Akers acted with malice. He has stated that "AKERS ACTED WITH MALICE AND THEREFORE IS NOT ENTITLED TO IMMUNITY UNDER THE ITCA." Dkt. 52, at 16 (capitalization in original). He continues that "[t]he same overwhelming evidence of Akers' personal animus and malice against Mr. Thomas [used to support Thomas' other claims] is more than sufficient on summary judgment to establish malice under Idaho Code § 6-904(3)." *Id.*

It is clear that Thomas' ITCA claim is primarily supported by his contention that Akers acted with malice. Accordingly, as a matter of law, Thomas cannot recover from the County for Akers' allegedly unlawful acts. Additionally, the Court finds no basis for a valid ITCA claim based upon the County's own conduct, or the conduct of Heward. The Court, therefore, GRANTS the Defendants' Motions for Summary Judgment on this claim.

### C. Motion to Strike

Finally, the County and Heward ask the Court to strike the Amended Declaration of Derek Thomas and other documents. Dkt. 57. They argue that a video (Dkt. 52-23, ex. 2), and photograph (Dkt. 37, ex. 1) were not produced until after discovery had closed. and should therefore be stricken from the record.

Under Federal Rule of Civil Procedure 37(c), a party that fails to provide information as required by Rule 26(a) or (e) is not allowed to use that information to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

justified or is harmless. Fed. R. Civ. P. 37(c); *see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Failure to follow the requirements of Rule 26 can result in sanctions under Rule 37(c)(1), which include the exclusion of an exhibit.

Here, Thomas has not shown that his failure to produce these items during discovery was substantially justified or harmless. Accordingly, the Court strikes these exhibits ((Dkt. 52-23, ex. 2; Dkt. 37, ex. 1) for purposes of the motions discussed in this order but refrains from deciding at this time whether those exhibits may be used at trial.[11]

Defendants also ask the Court to strike Thomas' combined statement of material facts for exceeding the page limitations set by Local Rule of Civil Procedure 7.1, as well as Dkt. 54 and Dkt. 55 for being untimely filed. The Court declines to do so. The County and Heward's Motion to Strike (DKt. 57) is, therefore, GRANTED in PART and DENIED in PART.

## V. ORDER

1. The County and Heward's Motion for Summary Judgment (Dkt. 23) is GRANTED. As there are no surviving claims against the County or Heward, they are both DISMISSED from this case.

2. Akers' Motion for Summary Judgment (Dkt. 24) is GRANTED in PART and DENIED in PART. As set forth above, only Thomas' First and Second Amendment Retaliation claims against Akers survive summary judgment.

---

[11] If this case proceeds to trial, Akers (if he so desires) must still file a proper motion *in limine* asking the Court to exclude these exhibits.

3. The County and Heward's Motion to Strike (Dkt. 57) is GRANTED in PART and DENIED in PART. The Court strikes Dkt. 52-23, ex. 2, and Dkt. 37, ex. 1 for purposes of the motions discussed in this order but refrains from deciding at this time whether those exhibits may be used at trial.

DATED: February 26, 2019

David C. Nye
Chief U.S. District Court Judge